NOT RECOMMENDED FOR PUBLICATION
File Name: 18a0447n.06
No. 17-3727

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | **FILED** |
| Plaintiff-Appellee, | ) | Aug 29, 2018 |
| | ) | DEBORAH S. HUNT, Clerk |
| v. | ) | |
| | ) | ON APPEAL FROM THE |
| ROMELL W. WHITESIDE, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE |
| Defendant-Appellant. | ) | SOUTHERN DISTRICT OF |
| | ) | OHIO |
| | ) | |
| | ) | |

BEFORE:    BATCHELDER, KETHLEDGE, and WHITE, Circuit Judges.

**ALICE M. BATCHELDER, Circuit Judge.**

A jury convicted Defendant-Appellant Romell Whiteside of numerous crimes related to drug sales and trafficking. Whiteside now lodges four challenges to his convictions and sentence: that the district court erred by (1) applying a sentencing enhancement for maintaining a premises for the purposes of manufacturing or distributing a controlled substance under USSG § 2D1.1(b)(12); (2) denying his *Batson*[1] challenge; (3) admitting testimony of a confidential informant; and (4) denying his Rule 29 motion for judgment of acquittal. The government concedes and we agree that the district court erred by applying the enhancement under USSG § 2D1.1(b)(12); we therefore VACATE Whiteside's sentence and REMAND for resentencing consistent with this opinion. We AFFIRM as to all other challenges.

---

[1] *Batson v. Kentucky*, 476 U.S. 79 (1986).

I.

In January 2011, Detective Walt Miller of the Columbus Police Department enlisted the help of D.F., a confidential informant, to perform a series of three controlled buys—on January 5, 10, and 12, 2011—at a residence on South Oakley Avenue in Columbus, Ohio.

At the first controlled buy, a black male carrying a large semiautomatic assault weapon opened the door and invited D.F. in. Once inside, D.F. requested a "dub"—a bag containing 0.2 grams of crack cocaine and costing $20. The black male used a digital scale on the kitchen table to weigh out the requested amount. D.F. paid for the drugs and exited the home. The substance D.F. purchased tested positive for cocaine.

At the second controlled buy, the same black male answered the door and invited D.F. in. D.F. noticed that the black male responded to the name "Big Mike," and had a black semiautomatic handgun tucked inside of his waistband. D.F. again paid the black male $20 in exchange for a dub and exited the home. The substance D.F. purchased tested positive for cocaine.

These first two controlled buys formed the basis of a warrant to search the South Oakley residence. Before executing the search warrant, however, police officers sent D.F. into the home one last time to perform a "prebuy"—in other words, to ensure first that the narcotics trafficking remained ongoing and to gather relevant information regarding any persons or weapons inside. During this third controlled buy/prebuy, either Big Mike or a white male answered the door, after which Big Mike weighed out a dub in exchange for $20. D.F. then exited the home and reconvened with the officers. The substance D.F. purchased tested positive for cocaine. D.F. reported that, in addition to Big Mike, several other people were inside the home. He also reported seeing several guns, including a black semiautomatic handgun inside Big Mike's waistband, just as during the January 10 controlled buy.

Approximately thirty minutes later authorities executed the search warrant. Big Mike—the defendant, Romell Whiteside—and three other people were in the kitchen. The kitchen contained a mechanical grinder and a digital scale—items indicative of drug trafficking. Police officers also recovered four loaded guns on a dresser in a nearby bedroom: a handgun, a shotgun, and two rifles.

Officers restrained the occupants' hands with zip ties and moved them to a different room. Detective Miller observed a baggie containing twenty to thirty "rocks" of crack cocaine at Whiteside's feet, prompting him to search Whiteside. In Whiteside's front pocket, Detective Miller found the $20 bill (identified by serial number) that law enforcement had provided to D.F. for the controlled buy that day.

Whiteside was arrested and charged in Franklin County Municipal Court. The charges were subsequently dismissed. Then, about a year later, Special Agent Paris Wilson of the Bureau of Alcohol, Tobacco, Firearms and Explosives began his own investigation into Whiteside and contacted Detective Michael Madry of the Columbus Police Department. Detective Madry informed Special Agent Wilson of Whiteside's January 2011 drug activity and the pair decided to take over from Detective Miller the investigation into Whiteside's drug activity.

To rejuvenate the investigation, Detective Madry questioned D.F. Detective Madry showed D.F. a photograph of Whiteside and asked whether D.F. recognized the person pictured. D.F. remembered that he had purchased crack cocaine from that individual at a South Oakley residence. D.F. stated that he had purchased drugs from the home on three occasions, but from Whiteside on only the latter two.[2] D.F. also recalled Whiteside's carrying a gun in his waistband. D.F. wrote this information on the back of the photograph and signed and dated it.

---

[2] This conflicted with D.F.'s testimony at trial that he had purchased drugs from Whiteside during all three buys.

Meanwhile, Special Agent Wilson enlisted the help of a different confidential informant to make additional controlled buys from Whiteside and to gain an introduction to Whiteside. On February 8, 2013, the informant called a phone number belonging to Whiteside, using the speakerphone feature so that Special Agent Wilson could hear the conversation. The informant addressed Whiteside as "Mel Mel" and told him that his relative (who was actually Special Agent Wilson) wanted to buy crack cocaine. Whiteside agreed to supply the drugs and invited the pair to a residence located on Kelton Avenue, which Whiteside indicated belonged to him.

The controlled buy went as planned. Special Agent Wilson equipped the informant with a transmitter and recording device and provided him with $1,200 of pre-marked currency. Special Agent Wilson waited outside while the informant went into the home to make the buy. Other members of law enforcement, including Detective Madry, stationed themselves nearby. Both Special Agent Wilson and Detective Madry saw the informant approach the residence, but their positioning prevented them from seeing him enter. Although Special Agent Wilson could not see the transaction, he could hear it. Among other things, he heard the informant refer to the seller as "Mel" several times during the transaction. After a few minutes, the informant reappeared and walked back to Special Agent Wilson's vehicle with a bag of crack cocaine. Special Agent Wilson removed the microchip from the recording device, plugged it into his computer, downloaded the recording, and erased the data from the microchip.

In late March, at Special Agent Wilson's direction, the informant again called Whiteside and arranged another drug transaction.[3] Again, Special Agent Wilson equipped the informant with

---

[3] Special Agent Wilson did not listen in on the call. However, the following day, the informant called Whiteside again, this time on speakerphone and in Special Agent Wilson's presence, to discuss the details of the transaction.

a wire and drove with the informant to the Kelton Avenue residence. Detective Madry drove separately and parked so that he could videotape the transaction.

Unlike the previous controlled buy where Whiteside was not aware of Special Agent Wilson's presence, this time Special Agent Wilson posed as the informant's relative and stayed in his car in view of Whiteside. When Whiteside arrived at the residence, the informant exited Special Agent Wilson's vehicle and spoke to Whiteside on the street. Whiteside placed the drugs on the tire of a vehicle and told the informant: "[I]t's right there. Get it, it's right there." The informant picked up the bag of crack cocaine Whiteside had deposited and returned to Special Agent Wilson's car. Special Agent Wilson provided $2,300 to the informant, who walked to Whiteside and handed him the money. Following the transaction, Special Agent Wilson removed the microchip from the informant's recording device, plugged it into his computer, downloaded the recording, and erased the data from the microchip.

One week after this transaction, Special Agent Wilson's computer crashed. The recordings from both the February and March transactions could not be retrieved.

The investigation and controlled buys resulted in an eight-count federal indictment against Whiteside. Counts 1 through 3 charged Whiteside with distribution of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and corresponded to the controlled buys organized by Detective Miller and D.F. at the South Oakley residence on January 5, 10, and 12, 2011. Counts 4 through 6 related to the search of the South Oakley Avenue residence. Count 4 charged Whiteside with possession with intent to distribute cocaine base, in violation of §§ 841(a)(1), 841(b)(1)(C); count 5 charged him with possession of a firearm in furtherance of count 4, in violation of 18 U.S.C. §§ 924(c)(1)(A) and 2; and count 6 charged him with being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Counts 7 and 8

charged Whiteside with distribution of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and corresponded to the controlled buys organized by Special Agent Wilson and Detective Madry that occurred at or near the Kelton residence on February 8 and March 27, 2013.

Whiteside exercised his right to a jury trial. During voir dire, the government moved to strike several jurors for cause, including Juror 6, a Caucasian, who "indicated he could not be fair in this case" because his nephew "was facing a trial in federal court." The government also was troubled by Juror 6's statement, in his screening questionnaire, that he did not know the occupations and employers of his adult children. The government later indicated that had Juror 6 not been excused for cause, it would have exercised a peremptory challenge based on the juror's lack of knowledge regarding his grown children's employment.

After the court struck Juror 6 and several other jurors for cause, the parties proceeded to the peremptory phase. The government sought to strike Juror 18—the lone black juror remaining in the jury box—peremptorily. The defense raised a *Batson* challenge, to which the government responded that it wished to excuse Juror 18 because, like Juror 6, Juror 18 had indicated in his screening questionnaire that he did not know the occupations and employers of his adult children. The government also noted that, in addition to not knowing information about his adult children's employment, Juror 18 also had two brothers with felony convictions and that Juror 18 did not know for what offenses his brothers had been convicted. The court concluded that the government had offered a race-neutral explanation for its challenge and asked the defense for a response. When no response was forthcoming, the district court excused Juror 18.

Following jury selection and opening statements, the government presented its case-in-chief. Special Agent Wilson, Detective Miller, Detective Madry, and a number of other witnesses, including D.F., testified. D.F. described the three controlled buys he made from the South Oakley

residence in January 2011 and identified Whiteside as the individual who sold him drugs. D.F. examined the Smith & Wesson 9 mm handgun that law enforcement found inside of the South Oakley residence and testified that it "look[ed] like the gun that was in Big Mike's waistband" when he purchased drugs on January 10 and 12. D.F. testified that he was familiar with firearms because he had previously worked as a security guard.

The other confidential informant did not testify. However, the law enforcement officers who supervised him did. Special Agent Wilson and Detective Madry detailed the February and March 2013 controlled buys and the drugs recovered from them, and they identified Whiteside as the person who dealt drugs to the informant outside of the Kelton residence on March 27.

In addition to hearing from those witnesses, the jury saw video of the March 27, 2013, controlled buy that Detective Madry had recorded. Although the camera did not capture Whiteside placing the drugs on the tire of the vehicle, it did show him arriving at the Kelton Avenue address, interacting with the informant near Special Agent Wilson's car, and then accepting payment.

Counsel for Whiteside did not present defense witnesses. Instead, he attacked the credibility of D.F. and the sufficiency of the government's evidence. Defense counsel highlighted discrepancies between D.F.'s trial testimony and his past statements. For example, one year after making the controlled buys, D.F. told Detective Madry that he had purchased drugs from the South Oakley residence three times, but that Whiteside was the seller on only two occasions. At trial five years later, however, D.F. testified that he had purchased drugs from Whiteside on all three occasions.

Defense counsel also emphasized certain admissions by D.F. on cross-examination. For example, D.F. admitted that he did not remember whether Whiteside or a white male answered the door of the South Oakley home on January 12, 2011. And Special Agent Wilson and Detective

Madry acknowledged that they did not see any part of the February 8, 2013, drug transaction, nor did they see Whiteside place drugs on the tire of the vehicle during the March 27, 2013, transaction.

At the conclusion of the government's case, the defense moved for a judgment of acquittal, but offered argument only as to count 7, which corresponded to the February 8, 2013, controlled buy. Defense counsel argued that the evidence was insufficient to sustain a conviction because there was no eyewitness testimony that Whiteside was the seller of the drugs. The district court acknowledged the lack of eyewitness testimony on this point and that the confidential informant had not testified, but nevertheless concluded that there was "sufficient circumstantial evidence before the jury that [the transaction] did take place and that [the drugs were] purchased from Mr. Whiteside." The court also overruled the motion for judgment of acquittal as to the remaining counts, finding "ample evidence of Mr. Whiteside's involvement" in the other crimes. The jury acquitted Whiteside of count 1, which related to the January 5, 2011, controlled buy, but convicted him of all other counts.

Following Whiteside's convictions, the U.S. Probation Office prepared a presentence report that included a two-level enhancement under USSG § 2D1.1(b)(12) for maintaining a premises for the purpose of manufacturing or distributing a controlled substance. The report cited several findings in support of its application of the enhancement: Whiteside "utilized the residences of 271 South Oakley Avenue and 875 Kelton Avenue to conduct drug transactions"; "[a]ccording to the government and agent, [Whiteside] controlled these properties"; Whiteside "answered the door at the 271 South Oakley residence prior to conducting the drug transactions"; and "Whiteside was observed accessing the Kelton Avenue address with a key" and performing renovations on the home.

Application of the two-level enhancement resulted in a total offense level of 26. A total offense level of 26, combined with a criminal history category of III, corresponded to a guidelines range of 78 to 97 months' imprisonment. Count 5 carried a consecutive mandatory minimum of 60 months' imprisonment, resulting in a guidelines range of 138 to 157 months' imprisonment.

Through counsel, Whiteside objected to application of the maintaining-a-premises enhancement. Defense counsel argued that "there was no evidence Whiteside controlled [the South Oakley or Kelton] properties." Counsel specifically contested the PSR's suggestion that Whiteside's answering the door at the South Oakley residence demonstrated his control of that residence. The district court overruled Whiteside's objection and applied the enhancement. According to the court, although no one testified that Whiteside controlled the properties, "the jury found that [he did] at the time that [he] sold drugs therefrom." The district court sentenced Whiteside to 78 months' imprisonment on the grouped counts (counts 2, 3, 4, 6, 7, and 8), plus 60 months' imprisonment on count 5.

Whiteside filed the instant appeal.

II.

A.

Whiteside asserts that he should not have received a drug-premises enhancement under USSG § 2D1.1(b)(12) because the government did not prove that he had the requisite control over the houses used in the drug sales. The government concedes that this issue should be remanded to the district court and Whiteside should be resentenced. We agree.

The drug-premises enhancement has three elements: The defendant must (1) knowingly (2) open or maintain any place (3) for the purpose of manufacturing or distributing a controlled substance. *United States v. Johnson*, 737 F.3d 444, 447 (6th Cir. 2013) (citations omitted).

Because this Guideline and 21 U.S.C. § 856, the "drug-house" criminal statute, use the same operative language (*maintaining*), precedent interpreting both the Guideline and the statute is instructive. *Id.*

At issue here is whether the government established that Whiteside maintained the premises for distributing drugs, so we must consider "whether the defendant held a possessory interest in . . . the premises" and "the extent to which the defendant controlled access to, or activities at, the premises." USSG § 2D1.1, cmt. n.17. But even "[i]f a defendant does not have a legal interest in the premises, the enhancement may still apply if the government makes a sufficient showing of de facto control." *United States v. Hernandez*, 721 F. App'x 479, 484 (6th Cir. 2018) (citing *United States v. Russell*, 595 F.3d 633, 644 (6th Cir. 2010) (discussing the analogous requirements of 21 U.S.C. § 856(a)(1)); *United States v. Tippins*, 630 F. App'x 501, 504 (6th Cir. 2015)). "[T]he government must show something more than the act of distribution from the premises" to prove control under this standard. *Id.* (citing *United States v. Clavis*, 956 F.2d 1079, 1090-91 (11th Cir. 1992) (followed by *Russell*, 595 F.3d at 644)). "Otherwise, the law would punish someone twice for the same act." *Id.*[4]

The record does not adequately establish elements required for application to Whiteside of the enhancement for the drug sales at the South Oakley or Kelton Avenue residences. Relative to the South Oakley residence, the government failed to establish that Whiteside exercised the necessary control over it. Conflicting trial evidence regarding Whiteside's role in the January 5, 2011, controlled buy; the jury's acquittal of him on the January 5, 2011, distribution count;

---

[4] We have not clearly articulated the standard of review for the many issues which may arise relative to the USSG § 2D1.1(b)(12) enhancement. *Hernandez*, 721 F. App'x at 484 n.1 (citing *United States v. Bell*, 766 F.3d 634, 636 (6th Cir. 2014)). "However, we need not decide that larger issue here. The issue before us now is purely legal—neither party appears to dispute the facts as they were decided by the district court." *Id.* "[R]egardless of what the standard of review might be in a more complicated case, we would review the legal-interpretation issue de novo." *Id.*

uncertain trial testimony by D.F. regarding whether Whiteside or another individual actually opened the door during another of the two remaining controlled buys; and evidence that several people were present at the residence when officers executed the search warrant and at the time of the distribution offenses call into question "the extent to which [Whiteside] controlled access to, or activities at, the premises." USSG § 2D1.1, cmt. n.17.

The government's case regarding the Kelton Avenue residence suffers from a different problem—failure to show more than the act of distribution from the premises. Proof of one drug transaction inside the home and another drug transaction on the street nearby, without more, does not sufficiently establish that drug activity was a primary use of the premises. *See Johnson*, 737 F.3d at 448 (drug distribution must constitute a "significant or important reason for which [the defendant] maintained his home rather than a mere incidental or collateral use" (citation and internal quotation marks omitted)).

Because the record does not support the drug-premises enhancement for either residence, we VACATE Whiteside's sentence and REMAND to the district court only for resentencing.

B.

Whiteside next argues that the government violated his right to equal protection when it used a peremptory challenge to strike Juror 18, the only remaining black member in the jury box. Whiteside's argument fails.

The Equal Protection Clause prohibits a party from using peremptory challenges to exclude members of the jury venire on account of their race. *Batson*, 476 U.S. at 85. To establish a purposeful-discrimination equal protection violation under *Batson*, the complaining party must make a prima facie showing that the peremptory challenge was based on race. *McCurdy v. Montgomery Cty.*, 240 F.3d 512, 521 (6th Cir. 2001) (citation omitted). If the complaining party

establishes a prima facie case, the burden shifts to the party making the strike to articulate a race-neutral explanation for removing the juror in question. *Id.* This explanation "need not be particularly persuasive, or even plausible, so long as it is neutral." *Id.* (quoting *United States v. Harris*, 192 F.3d 580, 586 (6th Cir. 1999)). "After the defending party offers its race-neutral justification, the challenging party must demonstrate that the purported explanation is merely a pretext for a racial motivation." *Id.* Throughout the *Batson* inquiry, the ultimate burden of persuasion always rests with the party challenging the strike, *id.*, and "it is the defendant's burden to rebut, to whatever extent possible, the prosecutor's reasons for exercising his or her peremptory strikes on the record at the time such reasons are proffered," *United States v. Harris*, 15 F. App'x 317, 321 (6th Cir. 2001).

Because Whiteside's counsel made no attempt to rebut the government's proffered race-neutral explanation at the time it was made, we review the district court's ruling on the objection for plain error. *United States v. Jackson*, 347 F.3d 598, 605 (6th Cir. 2003).[5] To establish plain error, the appellant must show (1) that an error occurred in the district court; (2) that the error was plain, i.e., obvious or clear; (3) that the error affected an appellant's substantial rights; and (4) that this adverse impact seriously affected the fairness, integrity or public reputation of the judicial proceedings. *United States v. Koeberlein*, 161 F.3d 946, 949 (6th Cir. 1998).

On appeal, Whiteside, for the first time, seeks to conduct a comparative-juror analysis based on his belief that the prosecution's (1) use of a for-cause strike against a white juror—Juror 6—who did not know his children's occupations or employers, and (2) failure to strike white jurors with family members having felony convictions prove that the government had a discriminatory purpose in removing Juror 18. The government contends that it would be improper and misleading

---

[5] We have also noted that "failure to argue pretext may even constitute waiver of [a defendant's] initial *Batson* objection." *Jackson*, 347 F.3d at 605.

to conduct a comparative-juror analysis for the first time on appeal. Though we have suggested in dicta that the court need not engage in comparative-juror analysis when one was not conducted before the district court, *see United States v. Mahbub*, 818 F.3d 213, 229 (6th Cir. 2016) (quoting *Snyder v. Louisiana*, 552 U.S. 472, 483 (2008) ("retrospective comparison of jurors based on a cold appellate record may be very misleading when alleged similarities were not raised at trial")), we have made clear that "it is appropriate to conduct a comparative juror analysis for the first time on appeal" in circumstances like those present here, namely "when: (i) the government purportedly strikes a venireperson because of an answer to a question posed during *voir dire*; (ii) venirepersons relevant to the comparison were asked the same question during *voir dire*; (iii) the relevant venirepersons actually answered that question in similar depth; and (iv) the purpose of the analysis is to show that the government treated jurors with similar answers differently." *United States v. Atkins*, 843 F.3d 625, 636 (6th Cir. 2016).

Whiteside's *Batson* challenge fails.[6] First, with respect to the comparison between Juror 18 and Juror 6, the government stated that its main concern with Juror 18 was that he did not know the occupations or employers of his adult children. The only other juror to answer this question similarly—Juror 6—was also excused from the jury. And though he was excused for cause because of his nephew's pending prosecution by the same U.S. Attorney's office, the government later noted that, had there not been reason to excuse Juror 6 for cause, it would have asked to peremptorily strike Juror 6 because of his lack of knowledge of his adult children's employment.[7]

---

[6] Because a *Batson* error is structural, requiring automatic reversal without a showing of prejudice, *United States v. McAllister*, 693 F.3d 572, 582 n.5 (6th Cir. 2012), this court has interpreted plain-error and clear-error review to have "no practical difference" in the context of *Batson* challenges, and thus "our analysis would not change in any respect if we applied [clear] error review." *Atkins*, 843 F.3d at 634 n.2.

[7] The exchange occurred as follows:

> THE COURT: [Assistant United States Attorney], what is the . . . basis for challenging [Juror 18], who I note is the only African-American in the venire?

In other words, the only other venireperson who shared the similarity to Juror 18 that troubled the government—a person who did not have knowledge of his adult children's employment—was also struck from the jury.

Whiteside's argument that the government discriminated against Juror 18 because white jurors who had family members with felony convictions were allowed to serve is equally unpersuasive. The government's stated purpose for removing Juror 18 was his lack of knowledge of his adult children's employment. The fact that he had two brothers with felony convictions and did not know what those convictions were for was merely an additional thumb on the scale supporting his removal. None of the venirepersons who were empaneled on the jury were comparable to Juror 18 as none of them had adult children about whom they did not know basic information.

C.

Whiteside argues that the district court erred by admitting certain portions of Special Agent Wilson's testimony in violation of his Sixth Amendment right to confront witnesses against him. We disagree.

The Confrontation Clause of the Sixth Amendment states, "[i]n all criminal prosecutions, the accused shall enjoy the right . . to be confronted with the witnesses against him." U.S. Const.

---

[AUSA]: I don't believe that [Juror 18] was the only African-American in the questionnaire[,] but he certainly was one in the box and I would acknowledge that. Your Honor, similar to the rationale we advanced [for Juror 6][,] [Juror 18] has two grown children. [But] [i]n response to question number 8, [which states], if your children are adults, list their occupation[s] and employers[,] [h]e says he doesn't know. That gives us concern for any juror, potential juror, as with Juror No. 3 [sic], who is a challenge for cause for other reasons. Additionally, Your Honor, you'll recall [that] two of his brothers have two felony convictions. That's [ ] further grounds for the government to believe that it's a sufficient challenge that's not race based.

THE COURT: [Defense counsel], anything to add?

[DEFENSE COUNSEL]: No, Your Honor. Thank you.

THE COURT: I do find, then, the government has set forth a legitimate basis for the exercise of the peremptory challenge as to Juror No. 18.

amend. VI. The Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Crawford v. Washington*, 541 U.S. 36, 59 n.9 (2004) (citing *Tennessee v. Street*, 471 U.S. 409, 414 (1985)).

Because Whiteside did not object to Special Agent Wilson's testimony at trial, we review for plain error. *Bowman v. Corr. Corp. of Am.*, 350 F.3d 537, 548 (6th Cir. 2003). However, violations of the Confrontation Clause are also subject to harmless-error analysis. *See Chapman v. California*, 386 U.S. 18, 22-23 (1967). Errors are "'harmless' in terms of their effect on the factfinding process at trial" where "the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986) (citations omitted). In such cases, an otherwise valid conviction should not be set aside. *Id.*

Whiteside argues that the district court improperly admitted out-of-court statements by a non-testifying confidential informant regarding Whiteside's "name and or nickname"; that Whiteside "was the voice on the other end of the recorded phone calls with the informant"; and "[w]hat the informant said." His arguments fail.

First, Whiteside has failed to properly develop an argument regarding the testimony of his name and nickname, because he does not cite to any specific testimony in the record or advance any line of argument as to why references to his name or nickname are hearsay. He merely states that "it was error for the admission o[f] testimony elicited by the government during the examination of Agent Paris Wilson . . . [about] [Whiteside's] name and or nickname." "Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *United States v. Sandridge*, 385 F.3d 1032, 1035 (6th Cir. 2004). "[A]nd because hearsay determinations turn entirely upon the precise words or conduct at issue," where a

defendant "does not direct the attention of this court to any of the statements that he considers improperly admitted, . . . we cannot make an informed judgment whether the trial court abused its discretion and must therefore uphold its decision." *United States v. Jeffries*, 457 F. App'x 471, 482 (6th Cir. 2012) (citing *United States v. Benson,* 591 F.3d 491, 502 (6th Cir. 2010); *United States v. Sandridge*, 385 F.3d 1032, 1035-36 (6th Cir. 2004)).[8] And, in any case, Special Agent Wilson became aware of Whiteside's "Big Mike" alias during the 2011 investigation, Whiteside's aliases were stored in a "criminal history database," and Special Agent Wilson testified that he had personal knowledge that Whiteside had "been called Mel before on the street."

Whiteside's challenges to other testimony are somewhat more specific and quote specific testimony that he wishes to challenge. However, Whiteside does not advance any specific arguments as to how each of these statements is hearsay, stating generally in summation why he believes he has "met the prongs necessary to establish plain error." The government argues that Whiteside's failure to advance how the challenged testimony is hearsay waives his arguments. But he has at least "direct[ed] the attention of this court to . . . statements that he considers improperly admitted," which presumably allows us to "make an informed judgment whether the trial court abused its discretion" as to these particular issues. *Id.*

To start, Whiteside challenges Special Agent Wilson's statement relating to the February controlled buy that law enforcement "had received Mr. Whiteside's phone number, the phone number he was using on that day." Nothing indicates that this testimony was based on an out-of-court assertion, rather than knowledge that Special Agent Wilson had obtained in the

---

[8] In an abundance of caution, the government makes exhaustive attempts to anticipate potential arguments Whiteside could make as to testimony introduced regarding his nickname. But even these arguments—had Whiteside articulated them—would fail on the merits.

investigation.[9]  *See United States v. Cromer*, 389 F.3d 662, 676 (6th Cir. 2004) (defendant's Confrontation Clause rights were not violated by testimony by a federal agent where the "exchange at least arguably did not even put before the jury any statements made by the CI").

Whiteside also challenges Special Agent Wilson's recitation of a conversation "[b]etween the informant and Mr. Whiteside" that Agent Wilson heard on speakerphone.  The agent's testimony was that "[t]he informant instructed Mr. Whiteside that his relative [who was actually Agent Wilson] . . . wanted an amount of crack cocaine and that Mr. Whiteside agreed to supply us with that."  If Whiteside is suggesting that Special Agent Wilson's description of the call depends on an out-of-court statement by the informant, he is not correct; the record does not support any assumption that the agent's identification of the other participant depended on information from the informant, rather than other information regarding the cell phone number to which Agent Wilson and the informant placed the call.  Whiteside has failed to show plain error.

As for the contents of the call, the government argues that it admitted the informant's statements to provide context for the controlled buy and Whiteside's statement that he would provide them with drugs—not to prove the truth of the matter asserted.  The statements of the informant were therefore at least arguably "offered not for the truth of the matters asserted but to give meaning to the admissible responses of [the defendant]." *United States v. Jones*, 205 F. App'x 327, 342 (6th Cir. 2006) (internal quotation marks omitted); *see also United States v. Hendricks*, 395 F.3d 173, 184 (3d Cir. 2005) (holding that "if a Defendant . . . makes statements as part of a reciprocal and integrated conversation with a government informant who later becomes unavailable for trial, the Confrontation Clause does not bar the introduction of the informant's

---

[9] Indeed, Special Agent Wilson testified that he had obtained a phone number he "believe[d] [was] associated with Mr. Whiteside" and had "a court-ordered phone ping on the phone."  Law enforcement then tracked the phone and followed it to a gas station where they encountered Whiteside.  And the person who answered the phone (and the seller who showed up for the meeting) answered to an alias that the agent knew was associated with Whiteside.

portions of the conversation as are reasonably required to place the defendant['s] . . . nontestimonial statements into context"). As the government asserted, the purpose of admitting those statements by the informant was not to prove the truth of them, but to provide context for Mr. Whiteside's agreement to supply cocaine—an admission of a party opponent under Federal Rule of Evidence 801(d)(2) that was properly admitted. Whiteside fails to demonstrate plain error.

Next, Whiteside argues that the district court should not have admitted Special Agent Wilson's statement relating to the February controlled buy that he "could hear the [drug] transaction" inside of the Kelton Avenue house and, as a result, "knew that [the informant] had purchased crack cocaine from Mr. Whiteside." But it is undisputed that Special Agent Wilson was listening in on the transaction, and any statements made by Whiteside and heard by Agent Wilson via the informant's recording and transmitting device would be admissible as statements of a party opponent. Fed. R. Evid. 801(d)(2). Further, the record does not indicate what statements formed the basis of the testimony, so we cannot say that this was plain error.

Whiteside's final challenges relate to two statements regarding the March 2013 controlled buy that were made by the informant and then relayed at trial by Special Agent Wilson. First, Special Agent Wilson testified regarding a telephone conversation between the informant and Whiteside. Specifically, Special Agent Wilson stated that he "was not privy to that phone call but the informant told [him] that [the informant] made contact with Mr. Whiteside and the deal was set to purchase two ounces of crack cocaine." Nothing suggests that this statement was offered as anything but background for what happened the next morning: Special Agent Wilson and the informant, together on speakerphone, called Whiteside to make further arrangements for the transaction and then went to the Kelton Avenue address as agreed upon during that phone conversation. *See Cromer*, 389 F.3d at 676-77 (testimony that merely provides background

-18-

information regarding the course of investigation does not violate the Confrontation Clause). In any event, Whiteside was not prejudiced by the admission of this testimony because Special Agent Wilson's testimony regarding the second call provided all the same details. Whiteside fails to demonstrate plain error.

Finally, Whiteside challenges another statement regarding the March transaction where Special Agent Wilson testified, in conjunction with the playing of a video from the March controlled buy, that when a vehicle pulled up to the Kelton residence, the informant said: "[T]hat's his car, that's his car." As with the other statements, it is at least not plain that this testimony was offered for the truth of the matter asserted rather than simply being volunteered by Special Agent Wilson with respect to the chain of events shown in the video.[10] Again, Whiteside fails to demonstrate plain error.

### D.

Whiteside challenges the sufficiency of the evidence to support his convictions for possession of a firearm in furtherance of a drug-trafficking crime (count 5), being a felon in possession of a firearm (count 6), and unlawful distribution of cocaine base (count 7).

We review sufficiency of the evidence de novo, asking whether, upon viewing all of the evidence in the light most favorable to the prosecution, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Whiteside carries a "very heavy" burden "because the reviewing court does not judge the credibility of witnesses or weigh evidence, and it draws all reasonable inferences in the government's favor." *United States v. Ostrander*, 411 F.3d 684, 691 (6th Cir. 2005).

---

[10] To the extent that these two portions of testimony were understood to be introduced for their truth (to show that Whiteside was the individual who sold the informant drugs) they had no effect on Whiteside's substantial rights. Both Special Agent Wilson and Detective Madry testified that they saw Whiteside engage in a transaction with the informant on that date. The video footage corroborated their identifications.

Circumstantial evidence alone is sufficient to sustain a conviction, and such evidence need not "remove every reasonable hypothesis except that of guilt." *United States v. Jones*, 102 F.3d 804, 807 (6th Cir. 1996) (internal quotation marks omitted) (quoting *United States v. Clark*, 928 F.2d 733, 736 (6th Cir. 1990) (per curiam)).

"Although specificity in a Rule 29 motion is not required, where the defendant makes a Rule 29 motion on specific grounds, all grounds not specified in the motion are waived." *United States v. Chance*, 306 F.3d 356, 369 (6th Cir. 2002) (citing *United States v. Dandy*, 998 F.2d 1344, 1356-57 (6th Cir. 1993)). Whiteside made a Rule 29 motion before the district court and offered specific argument as to only count 7. Though Whiteside advanced no specific arguments as to any other counts, his verbal motion "for dismissal pursuant to Rule 29 . . . without argument, with the exception of Count 7," suggests that he was making "a general motion and then highlighting aspects of the general motion," *United States v. Love*, 553 F. App'x 548, 553 (6th Cir. 2014). Therefore, we consider his arguments as to counts 5, 6, and 7.

The jury convicted Whiteside on counts 5 and 6—possessing a firearm in furtherance of a drug-trafficking crime and being a felon in possession of a firearm. Both convictions related to the January 12, 2011, search by law enforcement. Whiteside challenges only the possession element as to both convictions, arguing that the government did not prove that he possessed a weapon.

Possession under 18 U.S.C §§ 922(g)(1) and 924(c)(1) includes actual possession and constructive possession. *United States v. DeJohn*, 368 F.3d 533, 545 (6th Cir. 2004); *United States v. Jenkins*, 593 F.3d 480, 484 (6th Cir. 2010). "A weapon is 'actually' possessed if it 'is within the immediate power or control of the individual.'" *United States v. Walker*, 734 F.3d 451, 455 (6th Cir. 2013) (quoting *United States v. Murphy*, 107 F.3d 1199, 1207-08 (6th Cir. 1997)). "A

weapon is 'constructively' possessed if the government can show the defendant 'knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others.'" *Id.* (quoting *United States v. Craven*, 478 F.2d 1329, 1333 (6th Cir. 1973)). Either type of possession may be proven by direct or circumstantial evidence. *United States v. Arnold*, 486 F.3d 177, 181 (6th Cir. 2007).

When we view the evidence in the light most favorable to the prosecution, we find no merit to Whiteside's argument. D.F. testified that he purchased cocaine from Whiteside at a South Oakley residence on three occasions and that Whiteside possessed a firearm each time. During the January 10 and 12 controlled buys, D.F. testified, Whiteside had a black semiautomatic handgun tucked inside of his waistband. Within half an hour of the January 12 controlled buy, law enforcement searched the South Oakley residence, and found Whiteside in the kitchen. Although he was not carrying a firearm at the time, he was carrying crack cocaine packaged for distribution. And officers recovered several firearms from a bedroom that was "relatively close" to the kitchen, including a Smith & Wesson 9 mm handgun that matched the description D.F. provided, a shotgun, and two rifles.

At trial, D.F. examined the Smith & Wesson 9 mm handgun that law enforcement recovered and testified that it looked like the gun he had observed inside of Whiteside's waistband. From this evidence, when it is viewed in the light most favorable to the prosecution, any rational juror could conclude, beyond a reasonable doubt, that Whiteside possessed the Smith & Wesson 9 mm handgun when he dealt drugs to D.F. half an hour before law enforcement recovered the gun in the same house, and that he continued to control the handgun when officers found him in reasonably close proximity to it with a baggie containing twenty to thirty rocks of crack cocaine.

That D.F. admitted, on cross-examination, that someone other than Whiteside may have answered the door on January 12 does not undermine this conclusion. Though D.F. wavered regarding who opened the door, he did not waver regarding the details critical to the convictions: that Whiteside dealt cocaine while carrying a firearm. And the fact that Whiteside did not have a weapon on his person when police entered the residence does not undermine the sufficiency of the evidence, because any rational juror could have concluded that Whiteside, at the very least, had constructive possession of the Smith & Wesson 9 mm handgun, which was in close proximity to him, when authorities executed the search warrant.[11] *See, e.g.*, *Arnold*, 486 F.3d at 182-83 (affirming felon-in-possession conviction over sufficiency challenge, where the victim saw the defendant threaten her with a handgun minutes before the police discovered the handgun under the defendant's seat).

The jury convicted Whiteside on count 7—distributing cocaine base—on the basis of the controlled buy that occurred on February 8, 2013. Whiteside claims here, as he did below, that the government failed to prove his identity as the person who sold the drugs to the confidential informant. Specifically, Whiteside contends that "[t]here was never any testimony at trial that the person [who distributed drugs] inside 875 Kelton was [he]." The district court found that there was "sufficient circumstantial evidence before the jury that [the drug buy] did take place and that [the cocaine] was purchased from Mr. Whiteside" and "overrule[d] the motion for judgment of

---

[11] Because "the line of demarcation between 'actual' and 'constructive' possession is not analytically crisp," *Walker*, 734 F.3d at 456-57, the jury could have conceivably found Whiteside guilty of actual possession. "[A]ctual possession can be shown when there is no direct evidence of possession." *Id.* (citing *United States v. Morrison*, 594 F.3d 543, 545 (6th Cir. 2010); *United States v. Weems*, 322 F.3d 18, 22, 25 (1st Cir. 2003) (concluding the defendant was in actual possession of a gun found on the box spring of a bed that had previously been searched for guns after police pulled the defendant from the attic and onto the bed, even though the officers did not see him hold or drop the gun); *United States v. Phillips*, 239 F.3d 829, 837, 847 (7th Cir. 2001) (finding defendant had actual possession of a handgun "found under the cushion next to him on [a] sofa" to which he had "immediate access" in a crack house that he generally controlled)). In these cases, the government either proved the gun was in a position that was the "functional equivalent" of keeping a gun in a pocket or holster, *see, e.g.*, *Morrison*, 594 F.3d at 545, or introduced circumstantial evidence showing that the defendant had recently been carrying the weapon, as was the case here.

acquittal with respect to Count 7." The court also noted that it "believe[d] that there [was] ample evidence of Mr. Whiteside's involvement in the other . . . sales" for the jury to infer his involvement in the February 8, 2013, sale.

Although there was no eyewitness testimony (because the informant did not testify at trial and the transaction occurred inside the residence) to identify Whiteside as the person who made the drug sale on February 8, 2013, there was sufficient circumstantial evidence to support the jury's conclusion that Whiteside was the seller. The informant initiated the February drug deal by calling a phone number belonging to Whiteside and Special Agent Wilson heard the supplier respond to "Mel"—a nickname of Whiteside's. Additionally, the confidential informant set up two drug transactions with the same seller where eyewitness testimony and video footage of the March transaction identified Whiteside as the seller. It was therefore reasonable for the jury to infer that the March seller—who used the same phone number and answered to the same alias as the February seller—also supplied the drugs in February. Because the evidence was sufficient for the jury to find beyond a reasonable doubt that Whiteside distributed cocaine on February 8, 2013, the district court did not err by denying Whiteside's Rule 29 motion.

III.

For the foregoing reasons, we VACATE Whiteside's sentence and REMAND for resentencing consistent with this opinion, and AFFIRM on all other issues.