NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0394n.06

Nos. 22-6094/6101/6102

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Sep 20, 2024
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) ) ) | |
| v. | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE |
| MAURICE DUNCAN BURKS (22-6094); BRANDON DURELL HARDISON (22 6101); ELANCE JUSTIN LUCAS (22-6102), | ) ) ) ) ) | |
| Defendants-Appellants. | ) ) ) | OPINION |

Before: WHITE, STRANCH, and DAVIS, Circuit Judges.

**JANE B. STRANCH, Circuit Judge.** Maurice Duncan Burks, Elance Justin Lucas, and Brandon Durell Hardison appeal their criminal convictions and sentences stemming from their membership in the Clarksville deck, a regional subgroup of the Gangster Disciples gang. Burks brings several challenges to his conviction and sentence for racketeering and drug trafficking conspiracies. Lucas challenges the district court's finding of drug quantities at sentencing as violating his rights under *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000) and *Alleyne v. United States*, 570 U.S. 99, 103 (2013). Hardison challenges the sufficiency of the evidence supporting his convictions for murder in violation of the federal Violent Crimes in Aid of Racketeering (VICAR) statute and related gun charges. For the reasons that follow, we **AFFIRM**.

## I.    BACKGROUND

### A.    Facts

This appeal centers on members of the Gangster Disciples (GD), a gang founded by the 1960s merger of two Chicago-based street gangs headed by Larry Hoover and David Barksdale. *See United States v. Irwin*, 149 F.3d 565, 567 (7th Cir. 1998).  At its height, the gang realized $100,000,000 in profits per year from its drug business.  *See Shell v. United States*, 448 F.3d 951, 953 (7th Cir. 2006).  Over time, GD began operating across the United States, including in Tennessee.

#### 1.    Burks and Lucas

In 2010, Danyon Dowlen served as "governor" of the Clarksville faction, or "deck," of the GD, and Marcus Darden was his second-in-command.  Around 2011 or 2012, Burks assumed the positions of "enforcer" and "regent" (second in command) within the Clarksville GD.  In August 2013, Burks attended a gang meeting in Murfreesboro, Tennessee, where members beat another member for a perceived violation of gang rules.

At that time, Clarksville GD members were involved in cocaine trafficking.  Around 2011, Burks and Elance Lucas, another ranking member of the GD, found a new source of cocaine and worked as a team to cook, package, and distribute drugs in and from a location known as "the cave" in Guthrie, Kentucky.  This positioned the pair as the primary suppliers of cocaine for the Clarksville deck.  Burks sold crack cocaine in half-ounce and ounce quantities to GD members as well as individuals unaffiliated with the gang.

Burks used the drug proceeds to pay gang dues into a fund, known as a "box," from which money could be used to buy firearms.  Burks provided firearms to other GD members, who used the guns to protect themselves from rival gangs and to arm themselves while selling drugs.

According to Dowlen, Burks also fatally shot a rival gang member, Malcolm Wright at C-Ray's night club on November 3, 2012.

### 2.     Hardison

In June 2011, Dowlen and Tavares Trotter, a member of the GD, saw a man "throwing up the pitchforks," a symbol of the GD, and dancing in a night club where rival gang members were present. After connecting with the GD members at the club, Hardison began attending the Clarksville gang meetings and formed a close relationship with Trotter. During this time, Hardison made money selling marijuana; he did not have a "legitimate job."

On January 6, 2012, Hardison rode with three others—including Trotter and fellow GD member Lavell Traylor—to the residence of Derrick Sherden, another GD member. Sherden owed Hardison $80 for marijuana and Hardison wanted to collect the debt. Upon arrival, Hardison asked Sherden where his money was. Sherden responded that he was going to get the money; Hardison responded, "[s]ay no more," and walked out the front door to smoke. Sherden put on a CD and sat on the couch listening with Trotter. Hardison returned, took a pistol out of his pocket, and shot Sherden "straight in []his head" without warning. Trotter got up to run. Sherden's girlfriend, Amanda Weyand, was in the next room and started screaming. Hardison told Trotter to "go grab the girl"; Trotter refused and ran out the front door, where he heard four or five shots and more screaming. Trotter and Hardison drove away together, and Hardison said, "Man, if any one of you all say something about this, I'm going to kill y'all." Hardison instructed Trotter to do something with the gun; Trotter disposed of it in a river. Law enforcement arrived at the Main Street address later that day and found Sherden and Weyand dead.

At some point after the shootings, consistent with the GD procedures for "major incidents," Trotter reported the murders to Dowlen. The Clarksville GD deck met to discuss how to deal with

Hardison, who faced death for killing a fellow member of the GD. Darden wanted to kill Hardison; however, Dowlen advocated for Hardison, and GD leadership decided that "Hardison was in the right and he wouldn't be sanctioned or eradicated for" the killing. Following the murders, Hardison embraced a "Creeper da Reaper" persona, portraying himself as "the death dealer," "the one that took care of situations for the" gang.

### B.     Procedural History

A grand jury returned an indictment against 11 members of the Clarksville GD deck on June 29, 2017. A Third Superseding Indictment, filed on November 7, 2018, charged Burks and Lucas with participating in a racketeering conspiracy in violation of 18 U.S.C. § 1961(1) and (5), and conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine hydrochloride and 280 grams or more of crack cocaine, oxycodone, methadone, hydrocodone, and marijuana all in violation of 21 U.S.C. § 841(a)(1) and (b). On August 9, 2021, a grand jury returned a Fourth Superseding Indictment against Hardison, charging him with Racketeer Influenced and Corrupt Organizations Act ("RICO") conspiracy and related violence in aid of racketeering ("VICAR") counts in relation to the murders of Sherden and Weyand. Hardison's trial was severed from the other GD defendants. Burks and Lucas's trial began on March 1, 2019; Hardison was tried over 11 days in 2021, beginning October 18 and concluding on November 3.

#### 1.   Burks and Lucas Trial

During discovery, Burks filed motions for exculpatory evidence, and later moved to compel production of materials under *Brady v. Maryland*, 373 U.S. 83 (1963). The district court ordered the Government to provide a list of witnesses designated "highly sensitive," and related material to Burks by February 15, 2019, thirty days before trial, under the Jencks Act, 18 U.S.C. § 3500, *Brady*, and *Giglio v. United States*, 405 U.S. 150 (1972). Burks also filed a motion to

dismiss the indictment for delay, which was denied. The court also denied Burks's motion to sever his trial, and motion to reconsider, after which the Government tried Burks alongside four codefendants, including Lucas.

During voir dire, the Government exercised a peremptory challenge to strike Juror Number One, an African American woman. Burks's counsel raised a challenge under *Batson v. Kentucky*, 476 U.S. 79 (1986). The court denied the challenge, concluding that Burks failed to establish a prima facie *Batson* case, and that even if he had, the Government had offered a legitimate, nondiscriminatory reason for its decision to strike Juror Number One.

Prior to trial, Burks also moved on double jeopardy grounds to prevent admission of his previous guilty plea, conviction, and sentence in the Western District of Kentucky for possession with intent to distribute cocaine, that had stemmed from three controlled buys the Government identified as overt acts in furtherance of the conspiracy in this case. The court denied the motion, and the Government introduced evidence of the previous controlled buys and Burks's guilty plea at trial.

Dowlen testified that Burks was a member of the Clarksville GD deck and identified him in a Clarksville GD photo, testified that he had seen Burks with significant quantities of cash from time to time, and stated that Burks made his money from selling drugs. Dowlen also testified about Burks's alleged involvement in the C-Ray's shooting of Malcolm Wright:

> Q. Was Mr. Burks armed at the time?
> A. Yes.
> Q. What was he armed with?
> A. He had a—a compact .45.
> Q. A .45 caliber pistol?
> A. Yes.
> Q. And after he made those statements to you, did you ask him anything about the pistol he had?
> A. Yes. I asked him, "Is that the pistol right there?" Because I know he kept a—a similar .45 on him. And he told me, "Nah, this is a twin to that."

R. 2300, Trial Tr. Vol. 12, PageID 33426.

Another former member of the GD, Johnny Austin, testified that he was "nervous" because he was testifying at trial, and worried that "[t]hey going to kill me." The Government asked Austin if he was referring to GD members, and Austin responded that he was. Burks's counsel moved for a mistrial, which the court denied. Austin also testified that after he spoke with the Government while incarcerated, two GD members beat him up and told him that it was because he "was snitching" and that they were "going to get [him] again."

An agent with the Department of Alcohol, Tobacco, and Firearms (ATF), testified about another former GD member, Carlos Jordan, who agreed to work with the Government. When asked why the agency relocated Jordan, the agent responded that Jordan's "life was in danger," because "Gangster Disciple members were trying to find him to have him report to their security." Burks's counsel then renewed his motion for a mistrial due to improper statements, which the court again denied.

During its closing argument, the Government highlighted testimony regarding a December 17, 2010 controlled buy of 11.4 grams of crack cocaine from Burks. Reminding the jurors that they had "heard evidence about three different buys that year," the Government stated, "[i]f Mr. Burks made 25 of those sales in a year, meaning one every two weeks, that gets you over 285." Burks's counsel objected that this inference was too speculative. The court overruled the objection, finding that if the jury credited the evidence that Burks had been a drug dealer his whole life, they could make the inference that he completed 25 drug sales a year.

On April 29, the jury found Burks guilty on counts 1, 2, 10, 13, and 14, and found Lucas guilty on counts 1 and 2. Burks filed a motion for a New Trial or Judgment of Acquittal that resulted in the Government's dismissal of counts 10, 11, 13, and 14 of the indictment. In the

process of litigating Burks's motion, the Government notified Burks that it could not confirm that it had disclosed two documents containing *Brady* material to Burks prior to trial. One of the documents, Report of Investigation ("ROI") 660, memorialized conversations among Dowlen, ATF agents, and Government attorneys reflecting that Dowlen told the Government he "believed the gun Maurice BURKS used in the [Malcolm Wright] killing may have been a .40 caliber or a .45 caliber." Based on this disclosure, Burks again moved for a new trial, which the court denied.

2. Sentencing of Burks and Lucas

a. *Burks*

Burks's sentencing hearing took place on December 6, 2022. The Government called Lamar Warfield, a member of the Clarksville GD deck, as a witness; Warfield expressed his discomfort testifying for the Government against Burks, who he said, "was like family to me." Warfield testified that: Burks was already a GD member when Warfield joined in 2007; Burks and Lucas supplied Warfield with drugs to sell; between 2011 and 2015 or 2016, Burks sold Warfield between one and four ounces of drugs approximately once or twice a week; during this time, Warfield observed Burks at various locations around Guthrie "with about a kilogram of cocaine"; Burks and Lucas served as the primary drug suppliers for the Gangsters Disciples; and Burks was frequently armed with a .45 caliber handgun.

The district court calculated Burks's offense level as 43 and his criminal history category as VI, resulting in a recommended sentence of life imprisonment under the Sentencing Guidelines. After considering relevant factors under 18 U.S.C. § 3553(a), including racial issues in Guthrie, Kentucky, where Burks grew up, and drug activity by Burks's family members during his childhood, the court sentenced Burks to 420 months, or 35 years, of imprisonment per count to run concurrently. Burks timely appealed.

b. *Lucas*

On December 6, 2019, the district court initially sentenced Lucas to 240 months, or 20 years, each on counts 1 and 2, to run concurrently. On appeal, however, we vacated Lucas's sentence and remanded for resentencing because the district court "improperly relied on the jury's special-verdict findings" for the RICO conspiracy without making its own particularized findings regarding the drug quantities attributable to Lucas. *United States v. Lucas*, Nos. 19-6390/6392/6393/6394, 2021 WL 4099241, at *11-13 (6th Cir. Sep. 9, 2021).

Resentencing took place on December 7, 2022. Warfield testified that he used Lucas as a source for drugs from 2011 or 2012 until approximately 2017, and that he bought between one and four ounces of cocaine from Lucas once or twice a week during this time. Warfield also testified that he observed Lucas with "at least [one] kilogram of cocaine on at least one occasion during" this time period.

In the time between Lucas's initial sentencing and his resentencing, Hardison's case had gone to trial and Warfield had testified at that trial. At Lucas's resentencing, defense counsel objected that the Government knew at the time of Hardison's trial that Lucas faced resentencing and planned for Warfield to testify during Lucas's resentencing to strengthen the Government's sentencing position. This objective, Lucas's counsel submitted, was what led the Government to call Warfield as a witness at Hardison's separate trial—so that his consistent testimony across Hardison's and Lucas's proceedings would bolster his credibility. Reiterating that it was applying the preponderance of the evidence standard, the court found that Lucas was responsible for "between 10,000 and 30,000, approximately 26,350" kilograms of converted drug weight, leading to an offense level of 36. With Lucas's criminal history category of V, this offense level resulted in a Guidelines range of 292 to 365 months. The court then applied the § 3553(a) factors, and,

emphasizing Lucas's positive developments in custody since his original sentencing, sentenced Lucas to a below-Guidelines term of incarceration of 235 months, or just under 20 years.

### 3. Hardison Trial

Hardison's severed trial began on October 18 and concluded on November 3, 2021. Two of the charges against Hardison were for murder in aid of racketeering. To establish his guilt on those charges, the Government pursued a theory that Hardison murdered Sherden and Weyand to maintain or advance Hardison's position in the GD. GD members testified regarding the gang's rules, including that someone who fails to pay his debts, including money owed for fronted drugs, violates GD rules. The Government introduced testimony that GD members could swear an oath in the gang's name to promise payment; failure to honor the oath amounted to a violation of the gang's rules. Gang members were expected not to take any "disrespect from any other oppositions," such as rival gangs, and to go about "handling [their] business" while projecting strength.

The Government also introduced testimony from Traylor and Trotter, who rode in the car with Hardison to Sherden's house the night of the Main Street murders, and Dowlen. Trotter testified that Hardison told him Sherden had sworn an oath on the GD that he would repay Hardison for the drugs. Dowlen testified that some leaders of the GD wanted Hardison killed for murdering Sherden, a fellow GD member, but that Dowlen had helped convince the GD leaders that Hardison was in the right. Dowlen stated that Hardison gained significant respect from GD members due to his double homicide, because it demonstrated "his willingness to kill." The defense did not put on any evidence.

The jury found Hardison guilty on all counts, and Hardison filed a motion for judgment of acquittal. The court granted the motion in part, acquitting Hardison on count 6—witness

tampering in violation of 18 U.S.C. § 1512—but denying the motion as to the remaining counts. Hardison timely appealed.[1]

## II. ANALYSIS OF THE CLAIMS ON APPEAL OF BURKS AND LUCAS

This matter presents consolidated appeals by three different defendants arising from two different trials, over which this court has jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a). We begin by considering the challenges brought by Burks and Lucas.

### A. Burks and Lucas Trial

#### 1. Burks's Challenge to Courtroom Seating

Burks challenges the district court's requirement that the row of African American defendants sit behind their primarily white counsel at trial. Courtroom seating can implicate constitutional concerns, including when a defendant is seated in a way that impedes his "'ability to communicate' with his lawyer." *Deck v. Missouri*, 544 U.S. 622, 631 (2005) (quoting *Illinois v. Allen*, 397 U.S. 337, 344 (1970)). That is because "[a]n accused's right to be represented by counsel is a fundamental component of our criminal justice system." *United States v. Cronic*, 466 U.S. 648, 653 (1984). This principle requires a court "to conclude that a trial is unfair if the accused is denied counsel at a critical stage of his trial." *Id.* at 659.

Burks argues that the courtroom setup was unconstitutional and prejudicial because it hindered his ability to communicate with counsel, was "akin to shackling" before the jury, and risked aggravating jurors' potential implicit bias against African Americans. A district court's decisions regarding courtroom seating are typically considered a type of courtroom management

---

[1] The Government also filed a notice of appeal regarding the district court's judgment of acquittal on count six of the fourth superseding indictment. In its response brief, however, the Government does not renew this argument; it is therefore abandoned. *Robinson v. Jones*, 142 F.3d 905, 906 (6th Cir. 1998) ("Issues which were raised in the district court, yet not raised on appeal, are considered abandoned and not reviewable on appeal.").

and are reviewed for abuse of discretion. *See CBS Inc. v. Young*, 522 F.2d 234, 241 (6th Cir. 1975) (per curiam) ("Every trial judge is charged with the primary responsibility of ensuring that the judicial proceedings over which he presides are carried out with decorum and dispatch and thus has very broad discretion in ordering the day-to-day activities of his court."). *United States v. Jones*, 766 F.2d 994, 1004 (6th Cir. 1985), is instructive. There, the "18 defendants . . . were seated in two rows immediately behind the counsel table," and "were permitted to pass notes to their attorneys"; counsel were also allowed to leave the table to converse with their clients. *Id.* This court held that the seating arrangement did not violate the Sixth Amendment. *Id.*

The same is true here. A review of photographs of the courtroom confirms that Defendants were located close enough to counsel to confer. Further, the court moved counsel's table closer to the wall to ease Defendants' ability to speak with their counsel and follow along on the courtroom monitors. The district court thoughtfully considered how to enable the defendants to speak with their attorneys within the space and safety constraints presented by the courtroom, even observing that "not once did Defendants" during trial "suggest that they could not adequately consult with their counsel." On this record, we conclude that the courtroom seating did not violate Burks's rights, and the district court did not abuse its discretion in requiring this seating arrangement.

### 2. Burks's *Batson* Claim

A *Batson* challenge to a peremptory striking of a juror proceeds in three steps: "(1) the opponent of the peremptory strike must make a prima facie case that the challenged strike was based on race; (2) the burden then shifts to the proponent of the peremptory challenge to articulate a race-neutral explanation for the strike; (3) finally, the trial court must determine whether the opponent of the peremptory strike has proven purposeful discrimination." *United States v. McAllister*, 693 F.3d 572, 578 (6th Cir. 2012). Relevant evidence at *Batson*'s third step

can include comparator juror analysis, *see id. at* 581; disparate voir dire questioning of Black and non-Black prospective jurors, *see Miller-El v. Dretke*, 545 U.S. 231, 255-56 (2005); and other evidence indicating "that discrimination may have infected the jury selection process," *Johnson v. California*, 545 U.S. 162, 172 (2005). Each *Batson* step is mandatory: "the trial court may not short circuit the process by consolidating any two of the steps." *United States v. Kimbrel*, 532 F.3d 461, 466 (6th Cir. 2008). If the State gives "a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination," however, "the preliminary issue of whether the defendant had made a prima facie showing becomes moot." *Hernandez v. New York*, 500 U.S. 352, 359 (1991) (plurality opinion). This court reviews the district court's legal application of *Batson* de novo but reviews the court's ultimate *Batson* determination "with 'great deference,' under a clearly erroneous standard." *United States v. Mahbub*, 818 F.3d 213, 223 (6th Cir. 2016) (quoting *United States v. Cecil*, 615 F.3d 678, 685 (6th Cir. 2010)).

Burks's counsel raised a *Batson* challenge to the Government's use of a peremptory strike against Juror Number One, an African American woman. The court refrained from ruling on whether Burks met his prima facie burden, instead calling on the Government to offer a race-neutral reason for the strike. The Government responded that it struck Juror Number One because she did not initially respond that she could apply the reasonable doubt, rather than a higher, standard of proof. Burks disputed the factual basis of the challenge, contending that Juror Number One did not initially understand the question. The district court denied the *Batson* challenge, finding that Burks failed to establish a prima facie case and even if he had, the Government provided a legitimate, nondiscriminatory reason for its strike.

This record reflects that the court appropriately proceeded through each *Batson* step; at no point did it "short circuit the process by consolidating any two of the steps." *Kimbrel*, 532 F.3d at 466. After hearing from both sides, the court implicitly weighed the credibility of the Government's proffered race-neutral reason and found it "worthy of credence," *United States v. Wilson*, 11 F. App'x 474, 478 (6th Cir. 2001); the court then ruled on "the ultimate question" and determined that the Government's exclusion of Juror One did not evidence "discriminatory intent." *Hernandez*, 500 U.S. at 364. This procedure comported with *Batson* and the district court's determination was not clearly erroneous. *McAllister*, 693 F.3d at 578. Thus, we affirm the district court's determination that no *Batson* violation occurred.

### 3. Burks's *Brady* Claim

"This court reviews [the] denial of a motion for new trial based on *Brady* violations under an abuse of discretion standard." *United States v. Warshak*, 631 F.3d 266, 300 (6th Cir. 2010) (alteration in original) (quoting *United States v. Graham*, 484 F.3d 413, 416 (6th Cir. 2007)). "[T]he existence of a *Brady* violation," however, "is reviewed de novo." *Id.* (quoting *Graham*, 484 F.3d at 416-17).

A *Brady* violation consists of "three components": [1] "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Prejudice requires a demonstration "that the allegedly suppressed evidence was 'material.'" *Jackson v. City of Cleveland*, 925 F.3d 793, 815 (6th Cir. 2019) (quoting *Strickler*, 527 U.S. at 280). "Evidence is material when 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *France v. Lucas*, 836 F.3d 612,

630 (6th Cir. 2016) (quoting *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995)). "A 'reasonable probability' is 'a probability sufficient to undermine confidence in the outcome.'" *Id.* (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

In addition to *Brady*, the Jencks Act, 18 U.S.C. § 3500, governs the Government's discovery obligations to a criminal defendant. Specifically, "no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of [subpoena], discovery, or inspection until said witness has testified on direct examination" in the defendant's trial. 18 U.S.C. § 3500(a). Once the Government witness testifies, "on motion of the defendant," the court must "order the United States to produce any statement . . . of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified." *Id.* § 3500(b). This court has long held that "[w]hen *Brady* material sought by a defendant is covered by the Jencks Act . . . the terms of that Act govern the timing of the government's disclosure." *United States v. Davis*, 306 F.3d 398, 421 (6th Cir. 2002) (second alteration in original) (quoting *United States v. Bencs*, 28 F.3d 555, 561 (6th Cir. 1994)).

As an initial matter, Burks's challenge to the timing of the pre-trial disclosures fails. He identifies no *Brady* information that he was unable to "meaningfully use" at trial with only thirteen days' notice. And the material turned over pursuant to Jencks Act deadlines did not create a violation because the Jencks Act properly governed the timing of the Government's disclosure. *See Davis*, 306 F.3d at 421.

Burks also argues that the Government's failure to disclose ROI 660 until almost a full year after trial violated *Brady*, and that this violation requires reversal of Burks's conviction on counts 1 and 2. Applying the *Brady* components to the Government's failure to disclose ROI 660, defense

counsel could have seized on Dowlen's equivocal statement that the gun Burks allegedly used to kill Wright "may have been a .40 or a .45 caliber" to impeach Dowlen's credibility at trial. This satisfies the first *Brady* requirement, because the evidence would have been favorable to Burks. *See Strickler*, 527 U.S. at 281-82. Likewise, the Government's failure to produce ROI 660 by the court-ordered disclosure deadline or at any point during the trial meets *Brady*'s suppression requirement. *Id.* The third requirement, that there is a reasonable probability that disclosure of ROI 660 would have led to a different trial outcome, is where Burks's challenge falls short. *See id.*

We then consider whether the district court abused its discretion in denying Burks a new trial. District judges are afforded substantial discretion in granting a new trial, but this discretion should only be exercised in "extraordinary circumstance[s]." *United States v. Canal Barge Co.*, 631 F.3d 347, 357 (6th Cir. 2011) (alteration in original) (quoting *United States v. Hughes*, 505 F.3d 578, 593 (6th Cir. 2007)). In denying Burks's motion, the court emphasized that the new ROI 660 evidence pertained to the counts related to Wright's murder, which had been dismissed. The court determined that the undisclosed ROI did not undermine the distinct evidence supporting Burks's RICO and drug conspiracy convictions, for which the court had already denied Burks's motion for a judgment of acquittal or a new trial. This determination comported with the evidence in the record, including Burks's longtime membership in the Gangster Disciples; his service as the Clarksville GD official as a regent, coordinator, and enforcer; his attendance at GD meetings and payment of GD dues; his close association with Darden, the ringleader of the Clarksville GD during the period covered by the indictment; his participation in serving a violation in Murfreesboro on a GD member who failed to comply with the gang's bylaws; and his sale of drugs

to GD and non-GD members.  For these reasons, we affirm the district court's denial of Burks's motion for a new trial based on the Government's failure to turn over the ROI.

### 4. The Government's Trial Conduct Regarding Burks

Alleged prosecutorial misconduct to which a defendant objected at trial is subject to de novo review; unpreserved objections are reviewed for plain error.  *United States v. Bradley*, 917 F.3d 493, 505 (6th Cir. 2019).  To determine whether the alleged misconduct requires a new trial, "a court must first consider whether the prosecutor's conduct and remarks were improper." *United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001).  If they were, "the court must then consider and weigh four factors" to assess whether the impropriety was flagrant, thus warranting a new trial.  *Id.*  The factors are:  "(1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) whether the evidence against the defendant was strong."  *Id.*  The comments must be viewed in the context of the entire trial, and we must consider whether defense counsel's argument "invited" the Government's improper commentary.  *Id.*  "'[E]xceptionally flagrant' prosecutorial misconduct is grounds for reversal, even under a plain-error standard."  *Bradley*, 917 F.3d at 506 (alteration in original) (quoting *Carter*, 236 F.3d at 783).  Misconduct can include testimony the prosecutor improperly elicits from a witness, *see, e.g.*, *Slagle v. Bagley*, 457 F.3d 501, 518 (6th Cir. 2006) (considering prosecutorial misconduct challenge involving allegation that the prosecutor improperly elicited testimony), or improper statements made by the prosecutor during closing argument, *see Carter*, 236 F.3d at 784.

### a. Witness Testimony

Burks argues that two witnesses made improper statements. First, he argues that Johnny Austin's statement that the Gangster Disciples were "going to kill" him was improper. Second, Burks urges that the ATF officer's testimony that the Government relocated Carlos Jordan to another state because Jordan believed his life was in danger due to the GD was also improper. Both sets of statements prompted Burks's counsel to move for mistrial, which the court denied each time. On appeal, Burks argues that the Government pursued lines of questioning about Austin's and Jordan's nervousness because it wanted the jury to infer that Burks threatened these individuals, despite the lack of evidence that Burks ever threatened either one.

Applying *Carter*, 236 F.3d at 783, nothing in the record indicates that the Government pursued the two challenged lines of questioning to mislead the jury; rather, both sets of questions furthered the legitimate purpose of explaining the witnesses' testimony—why Austin feared testifying, and why Jordan moved to Alabama and was placed under Government protection. The challenged questions, moreover, were largely isolated, particularly when viewed in the context of the three-week trial. And, as explained below, other, stronger evidence, such as Burks's sustained membership and leadership in the GD and pronounced role in supplying drugs to GD members for further distribution, more directly supported finding Burks guilty on counts 1 and 2. On this record, we affirm the district court's denial of a mistrial based on the Government's questions related to Austin and Jordan's fear of the GD members.

### b. Closing Argument

"[W]hile counsel has the freedom at trial to argue reasonable inferences from the evidence, counsel cannot misstate evidence or make personal attacks on opposing counsel." *Carter*, 236 F.3d at 784. During closing, the Government invited the jury to infer that Burks made 25 drug

sales, each involving a similar quantity of drugs to those involved in the 2010 controlled buys. As the district court held, the Government's invitation was grounded in testimony it presented at trial; if the jurors found that evidence credible, the court reasoned, then they could reasonably draw this inference. Thus, we affirm the district court's determination that these statements by the Government did not warrant a mistrial.

### 5. Evidence of Burks's Prior Conviction

Burks challenges the admission of his guilty plea and the controlled buys underlying three of his 2010 convictions in Kentucky district court as violative of Double Jeopardy and his right to effective assistance of counsel. We take up each issue below.

#### a. *Double Jeopardy*

The Fifth Amendment's Double Jeopardy Clause "provides that no person shall 'be subject for the same offence to be twice put in jeopardy of life or limb.'" *United States v. Dixon*, 509 U.S. 688, 695-96 (1993) (quoting U.S. Const. amend. V). Under *Blockburger v. United States*, 284 U.S. 299, 304 (1932), courts apply "[t]he same-elements test" to determine whether a successive prosecution involving the same conduct for which a defendant already faced trial or sentencing violates the Fifth Amendment. *Dixon*, 509 U.S. at 696. If "each offense contains an element not contained in the other," then the successive prosecution does not offend double jeopardy; "if not, they are the 'same offence' and double jeopardy bars additional punishment and successive prosecution." *Id*. In the conspiracy context, "prosecution of a defendant for conspiracy, where certain of the overt acts relied upon by the Government are based on substantive offenses for which the defendant has been previously convicted, does not violate the Double Jeopardy Clause." *United States v. Felix*, 503 U.S. 378, 380-81 (1992). This court has recognized that when

a defendant is charged under RICO, "[t]he RICO offense . . . is an offense separate from the offenses charged as predicates." *United States v. Wheeler*, 535 F.3d 446, 454 n.3 (6th Cir. 2008).

Burks argues that introducing evidence of the three controlled buys in 2010 during the RICO trial violated the Double Jeopardy Clause because this conduct formed the basis for his conviction in the Western District of Kentucky. Consistent with *Felix* and *Wheeler*, the Government introduced this evidence to demonstrate that Burks committed overt acts in furtherance of the RICO conspiracy. Burks does not engage with either precedent to explain why they do not foreclose his arguments. We thus affirm the district court's decision on this issue.

### b. Ineffective Assistance of Counsel

Burks argues that his counsel in his prior criminal trial, in which he pleaded guilty to several drug offenses, was ineffective because counsel failed to inform Burks that his guilty plea could be used as evidence against him in a subsequent prosecution.

Generally, "an ineffective-assistance-of-counsel [IAC] claim may be brought in a collateral proceeding under [28 U.S.C.] § 2255." *Massaro v. United States*, 538 U.S. 500, 504 (2003). And such claims may sometimes—through rarely—be brought on direct appeal from the conviction in which the defendant alleges he was provided ineffective assistance of counsel. *See United States v. Bradley*, 400 F.3d 459, 462 (6th Cir. 2005).

Burks's procedural posture is distinct from both recognized methods of raising an IAC claim: he seeks to raise the claim on a direct appeal of a different case than the one in which he alleges he received ineffective assistance. *Bradley* stands for the proposition that a habeas petition, rather than a direct appeal, is more often the appropriate medium for pursuing an IAC claim due to the "scant information regarding the preparation of [a defendant's] trial counsel or his communications with [the defendant]" contained in the record of "most direct appeals." *Bradley*,

400 F.3d at 461-62. The record of a separate, later case contains even fewer clues regarding counsel's performance in the prior case. Indeed, here, the court is left to the general assertions of Burks's current counsel to assess the performance of Burks's attorney in the prior Western District of Kentucky proceedings. This is an insufficient basis for assessing Burks's claims. Thus, we decline to address Burks's ineffective assistance argument and affirm the district court's decision permitting the use of his prior guilty plea to show overt acts in furtherance of the RICO conspiracy.

6.      Burks's Motion for Severance

Federal Rule of Criminal Procedure 8(b) permits the Government to "charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). "Federal courts strongly favor joint trials because '[t]hey promote efficiency and "serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts."'" *United States v. Breinig*, 70 F.3d 850, 852-53 (6th Cir. 1995) (alteration in original) (quoting *Zafiro v. United States*, 506 U.S. 534, 537 (1993)). Generally, "[p]ersons jointly indicted should . . . be tried together, for 'there is almost always common evidence against the joined defendants that allows for the economy of a single trial.'" *United States v. Anderson*, 89 F.3d 1306, 1312 (6th Cir. 1996) (quoting *United States v. Phibbs*, 999 F.2d 1053, 1067 (6th Cir. 1993)). Severance is appropriate, however, if "a consolidation for trial appears to prejudice a defendant or the government." Fed. R. Crim. P. 14(a). Examples of circumstances warranting severance due to the severity of potential prejudice include "'mutually antagonistic' or 'irreconcilable' defenses." *Zafiro*, 506 U.S. at 538. Other probative facts include "whether spillover evidence would incite or arouse the jury to convict on the remaining counts, whether the evidence was intertwined, the similarities and differences between the evidence, the strength of the government's case, and the ability of the jury to separate

the evidence." *United States v. Soto*, 794 F.3d 635, 656-57 (6th Cir. 2015) (quoting *United States v. Dale*, 429 F. App'x 576, 579 (6th Cir. 2011)). At base, to show prejudice, "[t]he movant must demonstrate an inability of the jury to separate and treat distinctively evidence relevant to each particular defendant." *United States v. Swift*, 809 F.2d 320, 322 (6th Cir. 1987).

A district court's denial of a motion to sever is reviewed for abuse of discretion. *See United States v. Elder*, 90 F.3d 1110, 1118 (6th Cir. 1996). We have occasionally suggested that "a severance motion will be deemed waived if it is not renewed at the end of the evidence." *Swift*, 809 F.2d at 323. Other cases, however, have applied plain error review to denial of a motion to sever where a defendant raised it at some point before the district court but failed to renew it at the close of evidence. *See United States v. Walls*, 293 F.3d 959, 966 (6th Cir. 2002) ("Because the defendant failed to renew his motion to sever at the close of all the evidence, however, our review is for plain error."); *United States v. Kincaide*, 145 F.3d 771, 780 (6th Cir. 1998); *United States v. Anderson*, 89 F.3d 1306, 1312 (6th Cir. 1996). Here, we apply the plain error standard.

To satisfy plain error, a defendant must demonstrate "(1) error; (2) that was plain; (3) that affected a substantial right and that seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Sherrill*, 972 F.3d 752, 762 (6th Cir. 2020) (quoting *United States v. Fields*, 763 F.3d 443, 456 (6th Cir. 2014)). "To overturn a denial of severance, a defendant must show 'compelling, specific, and actual prejudice' resulting from the joint trial." *United States v. Ledbetter*, 929 F.3d 338, 346 (6th Cir. 2019) (quoting *United States v. Saadey*, 393 F.3d 669, 678 (6th Cir. 2005)).

Burks urges that the disparity in evidence presented against him as compared with his codefendants—in particular, the "days and days of testimony regarding Darden's social media confessions of his criminal activity"—prejudiced his defense. In support, Burks cites *United States*

*v. Davidson*, 936 F.2d 856, 861 (6th Cir. 1991), which held that the joinder of the two defendants resulted in "substantial prejudice from the spillover effect of the proof of the unrelated tax charges against [the Appellant's] absent co-defendant." But Burks's situation is distinguishable. Unlike Davidson, who faced trial on a single count of conspiracy to possess with intent to distribute heroin while his codefendant faced multiple unrelated charges pertaining to alleged tax fraud, *see id.* at 857, 860-61, each of the counts in the operative indictment in this case related to the common RICO and drug trafficking schemes.

Burks, moreover, fails to show that the jury was unable to separate and treat distinctively evidence relevant to each defendant. *Swift*, 809 F.2d at 322. In fact, the jury demonstrated this ability by holding different defendants responsible for different drug amounts. *See Lucas*, 2021 WL 4099241, at *8 (denying an appeal of a similar claim by Lucas). By extension, Burks cannot demonstrate that the failure to sever constituted a plain error "that affected a substantial right and that seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *Sherrill*, 972 F.3d at 762 (quoting *Fields*, 763 F.3d at 456). We affirm the denial of Burks's motion to sever.

### 7. Preindictment Delay of Burks

Burks also argues that the district court erred in denying his motion to dismiss the charges against him for preindictment delay. "A successful Due Process claim for pre-indictment delay requires that a defendant establish: (1) prejudice to his right to a fair trial, and (2) that the delay was intentionally caused by the government in order to gain a tactical advantage." *United States v. Wright*, 343 F.3d 849, 859 (6th Cir. 2003). "[I]n evaluating whether a defendant has satisfied the second 'intentional-delay' prong, '[i]t is well-established that a delay resulting from investigative efforts "does not deprive [a defendant] of due process, even if his defense may have

been somewhat prejudiced by the lapse of time."'"" *United States v. Lively*, 852 F.3d 549, 566 (6th Cir. 2017) (second and third alterations in original) (quoting *United States v. Rogers*, 118 F.3d 466, 476 (6th Cir. 1997)). "Both elements" impose a heavy burden on the defendant, as this court has recognized that he "who moves to have his indictment dismissed for pre-indictment delay faces an uphill battle." *Id.* This court reviews de novo the question of whether "the government's delay in indicting" the defendant "violate[d] his Fifth Amendment right to due process" and reviews the factual findings underlying the district court's denial of a motion to dismiss for pre-indictment delay for clear error. *Id.*

We begin by considering the second element: whether the delay was intentionally caused by "the Government to gain a decided tactical advantage." *United States v. Greene*, 737 F.2d 572, 575 (6th Cir. 1984). "[P]rosecutors are under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt." *United States v. Lovasco*, 431 U.S. 783, 791 (1977). Because "[t]he determination of when the evidence available to the prosecution is sufficient to obtain a conviction is seldom clear-cut, and reasonable persons often will reach conflicting conclusions," *id.* at 793, a prosecutor adheres to due process when he "refuses to seek indictments until he is completely satisfied that he should prosecute and will be able promptly to establish guilt beyond a reasonable doubt," *id.* at 795. In keeping with this principle, the bad faith inquiry "neither imputes nor presumes an improper purpose where the defendant simply cannot fathom a valid reason for the delay," but instead "requires [the defendant] to demonstrate that the Government 'had no valid reason for the delay.'" *United States v. Schaffer*, 586 F.3d 414, 426 (6th Cir. 2009) (quoting *United States v. DeClue*, 899 F.2d 1465, 1468-69 (6th Cir. 1990)).

Without direct evidence of bad faith, Burks asks the court to "infer prejudice," but *Schaffer* bars such an inference. In any event, the district court found that the Government's proffered justification for the delay—the need to fully investigate the alleged RICO conspiracy, a task that required over 100 interviews with potential witnesses and 800 investigatory reports—was credible and "sufficient to dispel any suggestion by Burks that the Government withheld indicting him in an effort to gain a tactical advantage." This finding was not clearly erroneous. *See Lively*, 852 F.3d at 566.

As to prejudice, Burks argues that the Government "sat on the case for nearly two and a half years" before indicting him, making it difficult to locate witnesses and documents. These concerns align with sister circuits' recognition that preindictment delay can prejudice a defendant "if a key defense witness or valuable evidence is lost, if the defendant is unable credibly to reconstruct the events of the day of the offense, or if the personal recollections of the government or defense witnesses are impaired," since such circumstances impinge on "the reliability of the proceedings." *United States v. Feinberg*, 383 F.2d 60, 65-66 (2d Cir. 1967) (internal citations omitted); *see also id.* (collecting cases). Still, "actual prejudice is difficult to prove." *United States v. Rogers*, 118 F.3d 466, 475 (6th Cir. 1997). "The death of a potential witness," much less difficulty locating a potential witness or faded memory of a located witness, does not necessarily satisfy actual prejudice. *Id.* at 475. On this record, Burks's assertion that the delay hindered his investigation and defense is insufficient to satisfy the prejudice prong. We affirm the denial of Burks's preindictment delay claim.

### 8. Burks's Evidence Sufficiency Claim

"This court reviews denials of motions for acquittal" based on evidence sufficiency de novo. *United States v. Walker*, 734 F.3d 451, 455 (6th Cir. 2013). In doing so, "[t]he Court must

construe the evidence in the light most favorable to the government, and then determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Clay*, 667 F.3d 689, 693 (6th Cir. 2012).

An "appellate court's reversal for insufficiency of the evidence" is the conclusion "that the government's case against the defendant was so lacking that the trial court should have entered a judgment of acquittal, rather than submitting the case to the jury." *United States v. Wettstain*, 618 F.3d 577, 583 (6th Cir. 2010) (quoting *Lockhart v. Nelson*, 488 U.S. 33, 39 (1988)). "A defendant claiming insufficiency of the evidence bears a very heavy burden," because "[c]ircumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt." *United States v. Jenkins*, 345 F.3d 928, 940 (6th Cir. 2003) (quoting *United States v. Stines*, 313 F.3d 912, 919 (6th Cir. 2002)). Still, "mere suspicion cannot sustain a verdict of guilt beyond a reasonable doubt." *Id.* at 942 (collecting cases). The inquiry "is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

Burks challenges the sufficiency of the evidence on the RICO conspiracy and drug conspiracy charges. The federal RICO Act bars "any person" from engaging in "a pattern of racketeering activity," 18 U.S.C. § 1962(c), and from "conspir[ing] to violate any of the provisions" of the statute, *id.* § 1962(d). To demonstrate a violation of § 1962(c), the Government must offer evidence of "(1) the conduct (2) of an enterprise (3) through a pattern of racketeering activity," *Salinas v. United States*, 522 U.S. 52, 62 (1997), which can include drug trafficking, *see United States v. Tisdale*, 980 F.3d 1089, 1092-96 (6th Cir. 2020) (discussing RICO conspiracy charges in the context of drug trafficking by alleged members of a street gang).

To convict a defendant of a substantive RICO offense, the Government must demonstrate "(1) the existence of an enterprise which affects interstate or foreign commerce; (2) the defendant's association with the enterprise; (3) the defendant's participation in the conduct of the enterprise's affairs; and (4) that the participation was through a pattern of racketeering activity." *United States v. Fowler*, 535 F.3d 408, 418 (6th Cir. 2008). "Unlike a substantive RICO charge," however, "a RICO conspiracy charge does not require proof that the defendant committed any predicate acts." *Id.* at 421. Instead, RICO conspiracy "merely requires proof that the defendant 'intended to further "an endeavor which, if completed, would satisfy all of the elements of a substantive [RICO] criminal offense [and] it suffices that he adopt the goal of furthering or facilitating the criminal endeavor."'" *Id.* (alterations in original) (quoting *Saadey*, 393 F.3d at 676). The "agreement does not have to be overt and may be inferred from a defendant's acts." *United States v. Nicholson*, 716 F. App'x 400, 408 (6th Cir. 2017). This formulation is consistent with Supreme Court precedent. *See Smith v. United States*, 568 U.S. 106, 110 (2013) (holding that to convict a defendant of RICO conspiracy, the Government must demonstrate "that two or more people agreed to commit a crime covered by the specific conspiracy statute (that a conspiracy existed) and that the defendant knowingly and willfully participated in the agreement (that he was a member of the conspiracy)").

Burks first challenges the sufficiency of evidence for his RICO conspiracy conviction. He argues that the Government failed to present any evidence of his involvement in the alleged gang conspiracy apart from his GD membership. Specifically, he contends that the Government's case against him on this charge rested on the murder of Malcolm Wright, a charge that was later dismissed, but which Burks claims the district court continued to consider during the trial and at sentencing.

In denying Burks's motion for judgment of acquittal on the RICO count, the district court explained that the evidence demonstrated that Burks:

(1) was a long-time member of the Gangster Disciples;

(2) served as a GD official, including periods as Regent, Coordinator, and Enforcer;

(3) attended numerous meetings, paid dues, and was identified on GD meeting and phone lists as Mac Reesy;

(5) was closely affiliated with Darden (the unquestionable ringleader of the 615 Region), and the two were often together and "like brothers," having both come from Guthrie;

(6) traveled with Darden to Murfreesboro to serve a violation on an errant gang member;

(7) sold 10.886 grams of cocaine on February 4, 2010 and 25.851 grams on February 26, 2010, and sold 11.4 grams of crack cocaine on December 17, 2010, as alleged in the Kentucky indictment;

(8) sold half- to one-ounce quantities of cocaine to Dowlen in 2012 and 2013 and sold cocaine to others at least 10 times during this period.

Viewing this evidence in the light most favorable to the Government, *see Jackson*, 443 U.S. at 319, Burks served a leadership role in the Gangster Disciples; participated in meetings, including at least one violation; armed GD members to confront rival gangs and further the gang's drug trafficking enterprise; and, alongside Lucas, served as the Clarksville GD deck's primary cocaine supplier. This record provides sufficient evidence of Burks's intent to further the GD's endeavors that constituted RICO offenses, even setting aside Burks's purported involvement in Wright's murder. *See Fowler*, 535 F.3d at 321. We affirm Burks's RICO conspiracy conviction.

Next, Burks challenges the sufficiency of evidence for the drug conspiracy conviction. A conspiracy requires three elements:

(1) An object to be accomplished. (2) A plan or scheme embodying means to accomplish that object. (3) An agreement or understanding between two or more

of the defendants whereby they become definitely committed to cooperate for the accomplishment of the object by the means embodied in the agreement, or by any effectual means.

*United States v. Gibbs*, 182 F.3d 408, 420 (6th Cir. 1999) (quoting *United States v. Bostic*, 480 F.2d 965, 968 (6th Cir. 1973)).

In the context of a drug conspiracy, the government must prove "(1) an agreement by two or more persons to violate the drug laws, (2) knowledge and intent to join in the conspiracy, and (3) participation in the conspiracy." *United States v. Paige*, 470 F.3d 603, 608 (6th Cir. 2006). We have long recognized that "to prove a single conspiracy, the government must show that each alleged member agreed to participate in what he knew to be a collective venture directed toward a common goal." *United States v. Warner*, 690 F.2d 545, 549 (6th Cir. 1982) (quoting *United States v. Martino*, 664 F.2d 860, 876 (2d Cir. 1981)). The "critical element" is "that the conspiracy involve more than an agreement to transfer drugs from one party to another." *United States v. Wheat*, 988 F.3d 299, 309 (6th Cir. 2021). Moreover, "[a]lthough only 'slight' evidence is needed to connect a defendant to a conspiracy, 'mere association with conspirators is not enough to establish participation in a conspiracy.'" *Gibbs*, 182 F.3d at 422 (quoting *United States v. Pearce*, 912 F.2d 159, 162 (6th Cir. 1990)). Specifically, it is the government's burden to "show the willful formation of a conspiracy and the willful membership of the defendant in the conspiracy." *United States v. Layne*, 192 F.3d 556, 567 (6th Cir. 1999).

Sixth Circuit precedent recognizes several facts that can allow a jury to infer the existence of a conspiracy. "In [21 U.S.C.] § 846 conspiracy cases," we have held that "circumstantial evidence that may establish that 'a drug sale is part of a larger drug conspiracy' includes advance planning, ongoing purchases or arrangements, large quantities of drugs, standardized transactions, an established method of payment, and trust between the buyer and seller." *United States v. Sadler*,

24 F.4th 515, 539 (6th Cir. 2022) (quoting *United States v. Williams*, 998 F.3d 716, 728 (6th Cir. 2021)); *see also Wheat*, 988 F.3d at 308-09 (discussing facts that can allow a jury to infer the existence of a conspiracy); *United States v. Martinez*, 430 F.3d 317, 334 (6th Cir. 2005) (holding that a defendant's connection to a conspiracy "can be inferred from evidence that he was involved in repeat drug transactions with members of the conspiracy").

Burks concedes that the Government produced evidence of his participation in a drug conspiracy: his conviction for drug trafficking in the Western District of Kentucky. Burks avers, however, that because this evidence involved a member of a different gang, it undermined the Government's argument that a single conspiracy existed. Burks also challenges the evidence of the drug quantity found by the jury.

The record contains facts that could demonstrate the existence of a conspiracy. For example, GD members paid into a fund including proceeds from drug sales and robberies, and from which members could borrow and repay. These funds also enabled the Gangster Disciples to buy guns, send money to members in jail, and pay "for anything . . . related to GD." Members of the GD were expected to attend meetings and to organize "to raise the stature" of the gang on the streets. This included organizing members to provide security and "protect [GD members] at all costs" when members went to a club or traveled anywhere in public. If a member of the GD needed guns for protection or to commit an act of violence, they could ask another member for a gun. The gang also held meetings, disciplined members for violations, collectively stored guns and drugs, and sold drugs at a business owned by a member of the GD.

Evidence also indicates that Burks sold drugs to make money. Testimony at trial established that Burks produced, packaged, and distributed drugs to other GD members, and that he sold drugs to a variety of individuals. Other evidence, moreover, demonstrated that Burks

supplied guns to GD members to aid in their drug trafficking. Applying the highly deferential standard from *Jackson*, on this record, a "rational trier of fact could find" the essential elements to sustain Burks's drug conspiracy conviction, and so we affirm. 443 U.S. at 319.

**B.**      **Sentencing of Burks and Lucas**

Both Burks and Lucas challenge their sentences. This court reviews a district court's sentencing for abuse of discretion. *Gall v. United States*, 552 U.S. 38, 41 (2007).

1.      <u>Burks</u>

Burks argues that the district court failed to adequately consider his background when imposing its sentence for his RICO and drug conspiracy convictions. Because that challenge presents a claim that the court "placed too much weight on some of the § 3553(a) factors and too little on others in sentencing the individual," it constitutes an argument that Burks's sentence was substantively unreasonable. *United States v. Rayyan*, 885 F.3d 436, 442 (6th Cir. 2018).

A sentence is substantively unreasonable if the district court "fail[s] to consider pertinent § 3553(a) factors or giv[es] an unreasonable amount of weight to any pertinent factor." *United States v. Collington*, 461 F.3d 805, 808 (6th Cir. 2006) (alterations in original) (quoting *United States v. Webb*, 403 F.3d 373, 383 (6th Cir. 2005)). This analysis "considers the totality of the circumstances." *United States v. Johnson*, 26 F.4th 726, 736 (6th Cir. 2022). "An abuse of discretion is established where the reviewing court is left with a definite and firm conviction that the district court committed a clear error of judgment." *United States v. Perez-Rodriguez*, 960 F.3d 748, 753 (6th Cir. 2020) (quoting *Coach, Inc. v. Goodfellow*, 717 F.3d 498, 505 (6th Cir. 2013)).

Burks argues that the district court failed to adequately consider how growing up in a segregated and racist community and observing drug use within his family influenced his

involvement with the criminal legal system. Burks urges that this background, along with his experiences as an African American and the continued racial discrimination he encounters in the criminal legal system, serve as mitigating factors that the court failed to appropriately consider.

The sentencing transcript belies Burks's arguments. In considering the relevant factors under 18 U.S.C. § 3553(a), the court acknowledged that the drug issues faced by Burks's family members "no doubt had an impact," and expressly stated that, although it had "considered all the arguments presented" including those pertaining to "the historical makeup of Guthrie . . . and the racial issues alluded to there," which were "no doubt true," those facts did not "create an excuse for the violence, the drug activity, and the firearms" Burks engaged with as a Gangster Disciple.

This record reflects that "the trial court follow[ed] proper procedures and g[ave] adequate consideration" to the § 3553(a) factors. *Holguin-Hernandez v. United States*, 589 U.S. 169, 173 (2020). "[T]he question for [this court]," therefore, "is simply . . . whether the trial court's chosen sentence was 'reasonable' or whether the judge instead 'abused his discretion in determining that the § 3553(a) factors supported' the sentence imposed." *Id.* (quoting *Gall*, 552 U.S. at 56). Burks's total offense level of 43 and criminal history category of VI resulted in a Guidelines range of life imprisonment. The court sentenced Burks to 420 months, or 35 years, of imprisonment per count, to run concurrently. This sentence was well below the Guidelines range, and not unreasonable given the mitigating factors considered. We affirm Burks's sentence.

2.      Lucas

Lucas argues that the district court violated Supreme Court precedent by determining the applicable drug quantity by a preponderance of the evidence at his resentencing. He also urges that the court committed procedural error in its calculation of the Guidelines range and reliance on Warfield's testimony, which Lucas argues is unreliable.

Under *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), with the exception "of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Building on *Apprendi*, *Alleyne v. United States*, 570 U.S. 99, 103 (2013), held that "[a]ny fact that, by law, increases the penalty for a crime is an 'element' that must be submitted to the jury and found beyond a reasonable doubt." But "*Alleyne* dealt with judge-found facts that raised the mandatory minimum sentence under a statute, not judge-found facts that trigger an increased guidelines range." *United States v. Cooper*, 739 F.3d 873, 884 (6th Cir. 2014). "Unlike the statutes at issue in *Alleyne* and *Apprendi*," the determination of a defendant's sentencing range under the Guidelines "do[es] not require a district court to give a defendant a higher sentence, nor do[es] [it] allow a judge to impose a harsher sentence that was necessarily unavailable before." *Id.*

Here, the court's factfinding regarding the quantity of drugs Lucas was responsible for resulted in a calculation of Lucas's final offense level as 36 and his criminal history category as V, leading to a Guideline range of 292 to 365 months, or 24.3 to 30.4 years. Though this change in his Guidelines range might seem much the same as a change in Lucas's applicable statutory sentencing range, under *Cooper*, they are distinct processes. And *Cooper* teaches that such a process does not violate *Alleyne* or *Apprendi*. *See id.*

Regarding Warfield's testimony, we emphasized in our previous order vacating Lucas's sentence and remanding for resentencing that "the government may introduce evidence about the scope of Mr. Lucas's individual agreement in the RICO conspiracy," and instructed the district court to "make any appropriate factual findings." *Lucas*, 2021 WL 4099241, at *13. The court's reliance on Warfield's testimony responded to that statement. The court's consideration of this testimony did not constitute error.

Finally, the court engaged in a thorough discussion of the § 3553(a) factors. This included consideration of Lucas's participation in a variety of programs, including educational programs and work assisting the suicide watch program. Ultimately, the court sentenced Lucas to 235 months' incarceration, a term below the applicable Guidelines range. This sentence comports with the "longstanding tradition in American law, dating back to the dawn of the Republic, that a judge at sentencing considers the whole person before him or her 'as an individual.'" *Concepcion v. United States*, 597 U.S. 481, 486 (2022) (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)). We affirm Lucas's sentence.

### III. HARDISON'S EVIDENCE SUFFICIENCY CLAIM

We turn now to Hardison's appeal. The jury convicted Hardison on six counts:

(1) Count 1: RICO conspiracy, with an acts-involving-murder enhancement applicable at sentencing, in violation of 18 U.S.C. 1962(d);

(2) Count 2: murder in aid of racketeering, in violation of 18 U.S.C. 1959(a)(1), the VICAR statute, for Hardison's murder of Sherden;

(3) Count 3: causing death through the use of a firearm, in violation of 18 U.S.C. 924(j), for Hardison's murder of Sherden;

(4) Count 4: murder in aid of racketeering, in violation of 18 U.S.C. 1959(a)(1), the VICAR statute, for Hardison's murder of Weyand;

(5) Count 5: causing death through the use of a firearm, in violation of 18 U.S.C. 924(j), for Hardison's murder of Weyand; and

(6) Count 7: assault resulting in serious bodily injury in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(3), for Hardison's involvement in Malcolm Wright's murder.[2]

The district court sentenced Hardison to concurrent terms of life imprisonment on counts 1, 2, and 4; ten years of imprisonment each on counts 3 and 5, to run consecutively to any other

---

[2] The district court granted Hardison's motion of acquittal on count 6, which charged Hardison with witness intimidation in violation of 18 U.S.C. § 1512. The Government does not challenge this ruling on appeal.

term of imprisonment; and a term of 20 years' imprisonment on count 7, to run concurrently with the sentences imposed on counts 1, 2, and 4. Hardison does not challenge his convictions or sentences on counts 1 and 7 on appeal.

As discussed above, *see supra* Part IV.A.8, when considering a sufficiency of the evidence challenge, we are to ask "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. Circumstantial evidence alone may sustain a conviction. *Jenkins*, 345 F.3d at 940. Still, "[g]uesswork is not reasonable inference." *Ledbetter*, 929 F.3d at 358.

In relevant part, the VICAR statute, under which the Government charged Hardison on counts 2 and 4, punishes the commission of violent crimes, including murder, for "anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity." 18 U.S.C. § 1959(a). VICAR "serves as a corollary to RICO," such that "VICAR charges can be added to RICO charges against alleged gang members to compound the effect of both statutes for violent offenses" committed in furtherance of a criminal enterprise. Lucy Litt, *RICO: Rethinking Interpretations of Criminal Organizations*, 26 Berkeley J. Crim. L. 71, 86 (2021). To convict a defendant of a VICAR offense based on murder, the evidence must demonstrate beyond a reasonable doubt that the defendant committed the murder "for pecuniary gain *from* the [gang] or to boost his position within the gang." *Ledbetter*, 929 F.3d at 356. "[A] defendant is not guilty of a VICAR crime when he acts 'alone and with no apparent connection to the gang.'" *United States v. Woods*, 14 F.4th 544, 556-57 (6th Cir. 2021) (quoting *Ledbetter*, 929 F.3d at 358).

Though the government need not "prove the defendant acted 'solely' or 'primarily' for a gang-related purpose," it must present evidence "that an 'animating purpose' of the defendant's action was to maintain or increase his position in the racketeering enterprise." *United States v. Hackett*, 762 F.3d 493, 500 (6th Cir. 2014). Put differently, "[a] jury can reasonably infer that motive where the evidence shows that a defendant committed the violent crime 'because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership.'" *Ledbetter*, 929 F.3d at 358 (quoting *United States v. Concepcion*, 983 F.2d 369, 381 (2d Cir. 1992)). Facts that may support VICAR liability include that "the violent crime 'was sanctioned by the gang and . . . the defendant participated because he knew it was expected of him as a member' or the crime 'fit the mold of the gang's typical missions against rival[s].'" *Woods*, 14 F.4th at 557 (alterations in original) (quoting *Ledbetter*, 929 F.3d at 358-59).

*Ledbetter* is instructive on the limitations applicable to VICAR liability. That case concerned the murder of an individual to whom the defendant, a member of the Short North Posse gang, sold drugs. *Ledbetter*, 929 F.3d at 356. We noted that though "there was plenty of evidence that Short North Posse members were expected to be violent and take part in sanctioned robberies and murders," the record did not support "that members were expected or encouraged to unilaterally rob and murder low-level drug users who otherwise supported the gang by purchasing its drugs." *Id.* at 358. On this basis, the court concluded that insufficient evidence supported the defendant's VICAR conviction. *Id.* at 359. "To find sufficient evidence of racketeering purpose here," *Ledbetter* emphasized, "would be to convert the violent-crimes-in-aid-of-racketeering statute into a gang-status crime, punishing any and all violent crimes by gang members, no matter

their relation to a racketeering enterprise." *Id.* at 356. The VICAR statutory text does not support such a broad interpretation.

Other cases provide additional guideposts. In *Woods*, for example, we affirmed the sufficiency of the VICAR evidence where the decedent was a member of a rival gang who fought the defendants and then mocked the defendants and their gang, HNIC, for fleeing from the fight. 14 F.4th at 549. There, testimony by another HNIC member that "it was important to HNIC to protect the gang's reputation" and "engage in retribution in response to any perceived disrespect" enabled a rational juror to conclude that the defendants murdered the rival gang member in conformity with HNIC's expectations. *Id.* at 557.

Similarly, *United States v. Odum* provides an example of "a 'spontaneous fight'" providing grounds for a jury to conclude that "an 'animating purpose' of the defendant's action was to maintain or increase his position in the racketeering enterprise.'" 878 F.3d 508, 519 (6th Cir. 2017) (quoting *Hackett*, 762 F.3d at 500), *vacated on other grounds sub nom. Frazier v. United States*, 139 S. Ct. 319 (2018). *Odum* noted that the defendant said "he joined the fight because he thought one of the other [gang members] had been knocked down," "leapt into action to support his fellow [gang members]," and "immediately reported his actions to [gang] leadership," all of which supported the theory that the defendant "was motivated by a purpose to maintain or increase his position" in the gang. *Id.*

The Government argues that Hardison's murder of Sherden and Weyand fits within VICAR because Hardison was seeking fame and believed that murder could help him achieve this goal. The district court agreed, emphasizing that the jury, like the GD leaders who considered eradicating Hardison for his violation of GD code, could conclude "that Hardison was 'in the right' under the Gangster Disciples' code" in committing the murders "because Sherden violated a sacred

oath." Sherden's disrespect, which consisted of his failure to honor "a debt that he solemnly vowed to repay" and "display[ing] a weapon throughout the time Hardison was in the residence," viewed in context of the centrality of respect to GD life, the court emphasized, provided further support for the jury's guilty verdict on the VICAR murder counts. Based on this trial evidence, the court below concluded that "the jury could have easily determined that the murders were not so much over a petty drug debt as they were about showing respect to a Gangster Disciple who viewed himself as tough and wanted his fellow [GD members] to know it." "Applying the deferential *Jackson* standard, as we must, and "viewing the evidence in the light most favorable to the prosecution," a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. We therefore affirm.

## IV. CONCLUSION

For the foregoing reasons, we **AFFIRM** on all grounds.